Melvin C. NIELSEN and Peter C. Kostantacos, Plaintiffs,

v.

Daniel B. GREENWOOD, James B. Knoll, Carl Gorychka, Carl F. Wangaard, William E. Dotterweich, Donald K. McKay, William W. Robertson, Gregory J. Ziols, Kidder, Peabody & Co., Piper, Jaffray & Hopwood, Incorporated, Specialty Equipment Companies, Inc., SPE Acquisition, Inc., and General Electric Capital Corporation, Defendants.

No. 91 C 6537.

United States District Court, N.D. Illinois, Eastern Division.

March 24, 1994.

Terry Rose Saunders, Arthur T. Susman, P. Terrance Buehler, Susman, Saunders & Buehler, Chicago, IL, for plaintiffs.

Kevin M. Flynn, Coffield, Ungaretti and Harris, Walter C. Carlson, Sidley & Austin, Chicago, IL, for defendants.

### ORDER

LINDBERG, District Judge.

Having conducted a *de novo* review of the record, the court accepts both of Magistrate Judge Pallmeyer's well reasoned reports and recommendations and overrules the parties' objections thereto. Defendants' motions to dismiss counts I, IV and V are granted. Defendants' motions to dismiss counts II and III are denied.

### *REPORT AND RECOMMENDATION*

#### Feb. 26, 1993.

PALLMEYER, United States Magistrate Judge.

In November 1988, Defendant Specialty Equipment Companies, Inc. ("Specialty"), the sole subsidiary of Defendant SPE Acquisition, Inc. ("SPE Acquisition"), issued and offered for sale to the public "Senior Subordinated Debentures" ("Debentures") valued at $150,000,000 in an attempt to raise revenue to repay part of the financing debt incurred when SPE Acquisition purchased Specialty. Plaintiffs Melvin C. Nielsen ("Nielsen") and Peter C. Kostantacos ("Kostantacos"), who purchased Debentures worth $100,000 and $50,000 respectively, brought this class action against SPE Acquisition; Specialty; Specialty's directors and officers; the co-underwriters of the November public

offering; and General Electric Capital Corporation ("GECC"), which helped finance SPE Acquisition's purchase of Specialty. The action is brought on behalf of a proposed class of all persons who purchased the Debentures between November 15, 1988 and March 16, 1991.

Defendant Specialty, a Delaware corporation with executive offices in Illinois, manufactures and markets institutional food service equipment. Defendant SPE Acquisition is a Delaware corporation owned by certain members of Specialty's management and formed for the purpose of acquiring Specialty. Defendants Daniel B. Greenwood, James B. Knoll, Carl Gorychka, Carl F. Wangaard, William E. Dotterweich, Donald K. McKay, William W. Robertson, and Gregory J. Ziols are the officers and directors of Specialty. Defendant GECC, the senior lender, is a New York corporation maintaining an office in Chicago, Illinois. GECC is owned by General Electric Financial Services, Inc. Defendant Kidder, Peabody & Co. ("Kidder"), one of the underwriters for the Debenture offering, is an investment banking firm engaged in the underwriting of securities and maintains its principal offices in New York, New York. Kidder is also owned by General Electric Financial Services. Defendant Piper, Jaffray & Hopwood ("PJH"), the other underwriter, is an investment banking firm engaged in the business of underwriting securities and maintains its principal executive offices in Minneapolis, Minnesota.

### *PROCEDURAL BACKGROUND*

Plaintiffs filed a five-count Amended Complaint on October 17, 1991. The Amended Complaint charges Defendants with violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 (Count I), §§ 11 and 12 of the Securities Act of 1933 (Counts II and III), common law fraud (Count IV), and negligence (Count V).

In December 1991, Defendants Specialty Equipment Companies, Inc. and SPE Acquisition, Inc. filed a motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) for failure to state a claim upon which relief can be granted. On December 18, 1991 Judge Lindberg denied

that motion on the basis that it improperly relied on matters outside of Plaintiffs' complaint. Defendants Specialty and SPE Acquisition moved for reconsideration; prior to a ruling, however, Specialty and SPE Acquisition filed for protection in bankruptcy court. All proceedings concerning them have been stayed by this court pursuant to an order dated January 8, 1992. The officers and directors of Specialty have adopted Specialty's motion to dismiss and for reconsideration, however. In addition, in January 1992, Defendant GECC moved to dismiss the § 10(b) claim and common law fraud claims. FED.R.CIV.P. 12(b)(6); 9(b). In January 1992, Defendant Kidder also moved to dismiss all counts against it for failure to state a claim.

On January 6, 1992, Defendant PJH moved to stay the proceedings and to compel arbitration of all Plaintiffs' claims against PJH. Plaintiffs moved to certify the class action on January 8, 1992; Judge Lindberg deferred ruling on the certification motion pending rulings on the motions to dismiss.

On January 22, 1992, Defendant PJH reasserted its motion to stay the proceedings and compel arbitration. The following month, the case was referred to these chambers pursuant to Local General Rule 2.41(B). Defendant PJH's motion to stay proceedings and compel arbitration and Defendants' three motions to dismiss are now before this court. Also pending are Defendants' motions for stay of discovery pending the court's ruling on the motions to dismiss. PJH's motion to compel is addressed in a separate Report and Recommendation issued simultaneously with this one. This Report addresses the three motions to dismiss and recommends that they be granted in part and denied in part for the reasons discussed below.

### FACTUAL BACKGROUND

For purposes of the motions before the court, the facts alleged in the Amended Complaint, summarized below, are presumed true.

#### Acquisition of Specialty

Defendant Specialty designs, manufactures, and markets a "broad line of commer-cial and institutional food service equipment." (Amended Complaint, ¶ 7(b).) In 1988, "certain members of the management of Specialty" (the Amended Complaint does not identify them by name) decided to buy Specialty from its original owners. (Id. ¶¶ (a), 22, 23.) As part of this effort, these individuals formed SPE Acquisition. (Id. ¶ 8.) Through a subsidiary, SPE Acquisition Sub, SPE Acquisition "made an all cash tender offer for the common and preferred stock of [Specialty]." (Id. ¶ 23(a)(i).) Pursuant to this offer, on September 9, 1988, SPE Acquisition Sub purchased 6,132,527 shares of Specialty's common stock and all 3,680 shares of Specialty's preferred stock for approximately $300 million. (Id. ¶ 23(a)(ii).) SPE Acquisition then merged SPE Acquisition Sub into Specialty, thus rendering Specialty the sole subsidiary of SPE Acquisition. (Id. ¶ 23(a)(iii).)

SPE Acquisition financed this purchase with a $283 million interim loan from Defendant GECC. (Id. ¶ 23(b).) The total amount required to complete the transaction, however, ultimately reached $500.3 million. (Id. ¶ 24.) In order to cover the difference, SPE Acquisition converted its loan from GECC into "permanent financing" which consisted of several loans under a "Senior Loan Agreement," with GECC as both an agent and a member of the senior lender group. SPE Acquisition also took on additional independent debt. (Id. ¶ 24.) The Senior Loan Agreement included (1) a "12–year, $225 million senior term loan ... entered into between [Specialty] and [the senior] lender group," and (2) a "10–year $70 million revolving line of credit." (Id. ¶ 24(i)(ii).) In addition to the financing under the Senior Loan Agreement, SPE Acquisition received financing consisting of (1) a "$150 million bridge loan" from Kidder Peabody Group, Inc., a subsidiary of Defendant Kidder; (2) "investment by management of $8.3 million (consisting of $400,000 in cash and $7.9 million in options, rights and warrants) in return for common stock of SPE Acquisition"; and (3) a "purchase of $47 million in 9.5% cumulative preferred stock and warrants for up to 70% of the common stock of SPE Acquisition" by members of the senior lender group. (Id. ¶ 24(iii)(iv)(v).)

In November 1988, Specialty issued Senior Subordinated Debentures valued at $150 million and offered them for sale to the public pursuant to the Prospectus and Registration Statement dated November 15, 1988. (*Id.* ¶ 25(a).) According to the terms of the Prospectus, the Debentures provided for dividends payable at a rate of 13.75%, payable semiannually on November 15 and May 15. (*Id.*) Specialty intended to use the proceeds from the sale of these debentures to repay the $150 million "bridge loan" from Kidder Peabody Group, Inc. (*Id.* ¶ 25(b).) Defendants Kidder and PJH served as co-underwriters for the public sale. (*Id.* ¶¶ 18(c) & 19(b).)

Pursuant to Specialty's public offering, Plaintiff Peter Kostantacos and Plaintiff Melvin Nielsen, both of Rockford, Illinois, purchased Debentures worth $50,000 and $100,000, respectively in November 1988 and February 1990. (*Id.* ¶ 6.)

**The Prospectus**

In conjunction with this sale, Specialty and certain of its officers and directors prepared and filed with the Securities & Exchange Commission a Registration Statement, including a Prospectus, which purported to describe the risks associated with the Debentures in light of Specialty's debt load (i.e. the "permanent financing"), the subordinate position of the Debentures to the rights of the senior lender group as provided in the Senior Loan Agreement, and the remedies available to the senior lender group under the Senior Loan Agreement in the event of any default by Specialty. As more fully described below, Plaintiffs allege that the Prospectus contains material misrepresentations and omissions. (*Id.* ¶ 2.)

Before considering Plaintiffs' specific challenges, a brief overall review of the Prospectus is appropriate. The Prospectus is a 53–page document, exclusive of financial statements attached as exhibits. In spite of its length and detail, the Prospectus states at its outset that it does not contain all of the information in the Registration Statement and that statements appearing in the Prospectus are qualified in all respects by the Registration Statement. (Prospectus, at 2.)

**A. *Description of Risk Factors***

A lengthy description entitled "RISK FACTORS" begins at page 7 of the Prospectus. That description points out that Specialty (referred to in the Prospectus as "the Company") is highly leveraged and has long-term debt of approximately 92.5% of its total capitalization. (*Id.* at 7.) It states, further, that although the Company "believes that its cash flow from operations" will meet debt service obligations, "there can be no assurance that it will be able to do so." Potential investors are reminded that Debentures will be subordinated "to all Senior Debt (as defined in the Indenture), including the Senior Term Loan and borrowings under the Revolving Credit Facility." (*Id.*) Accordingly, in the event of a default resulting in acceleration of the Senior Debt, including a default in payment of the Debentures, senior lenders "would be entitled to payment in full before any payment to holders of the Debentures would be permitted." If there were such a default, the Prospectus states, "it is possible that there would be insufficient assets" to pay the Debenture holders and, "so long as a default exists in respect of Senior Debt," payments to Debenture holders "may be prohibited." Further, although the Senior Debt is secured by all of the Company's assets, the Debentures would only be unsecured obligations. (*Id.*) Finally, the Prospectus points out that the Company is subject to "financial and operating covenants" in the Senior Loan Agreement, and that the Company's failure to comply with those covenants would permit the senior lenders "to accelerate the maturity of the Senior Term Loan or the Revolving Credit Facility, preclude the payment of principal of or interest on the Debentures or both." (*Id.* at 8.)

**B. *Description of Senior Loan Agreement***

A detailed summary of the Senior Loan Agreement begins at page 38 of the Prospectus. The Agreement itself, the Prospectus explains, is attached as an exhibit to the Registration Statement. Again, investors are reminded that the information contained in the Prospectus is incomplete and is subject to and qualified by the information in that

Agreement. The summary contained in the Prospectus does explain that GECC would be paid an agency fee of .25% per annum of the outstanding senior debt balance and that "[a] default rate of interest of 4% above the applicable rate will be charged upon the occurrence and during the continuance of a payment default under the Senior Loan Agreement." (*Id.* at 38.) The summary explains, again, that the senior debt is secured by a first lien on "substantially all existing or acquired tangible and intangible assets of the Company...." (*Id.*) It explains, further, that the Senior Loan Agreement requires the Company to maintain particular debt-to-cashflow and cash-flow-to-fixed-charges ratios that vary over the life of the Agreement. (*Id.*) If the Company fails to comply with these ratios, the summary states, the senior lenders "may require the Company to sell assets" at fair market values and use the proceeds to pay Senior Debt. Finally, the summary identifies three types of defaults, including (i) failure to make payments on the Senior Loan Agreement, or failure to maintain the financial ratios; (ii) default on other indebtedness, "including the Indenture relating to the Debentures"; and (iii) entry of judgment against the Company or initiation of bankruptcy. (*Id.* at 39.) Upon the occurrence of such an event of default, the summary states, the senior lenders "may accelerate all amounts due under the Senior Term Loan and Revolving Credit Facility and/or exercise their rights to seize and sell collateral pledged by the Company as security." (*Id.*)

### C. *Description of Debentures*

Finally, the Prospectus contains a detailed "DESCRIPTION OF DEBENTURES" section, beginning at page 40. In support of their claims that the Prospectus was materially misleading, Plaintiffs focus particularly on this section. Because of their importance to this case, portions of the subsection titled "Subordination" are quoted at length below. Initially, the subsection reiterates the Debentures' fully subordinated status:

> Payment by the Company of the principal amount of and interest on the Debentures will be subordinate to the prior payment in full, in cash or cash equivalents, of all obligations payable in respect of Senior Debt of the Company, whether outstanding at the time of issuance of the Debentures or thereafter created.

(*Id.* at 41.)

Further down the page, however, the Prospectus language appears to distinguish a default in payment on the Senior Debt from other defaults. Thus, with respect to a payment default, the Prospectus states:

> The Indenture will provide that no direct or indirect payment may be made by or on behalf of the Company of principal, premium, if any, or interest on the Debentures, whether pursuant to the terms of the Debentures or upon acceleration or otherwise, if at the time of such payment there exists a default in the payment of all or any portion of principal, premium, if any, or interest on, or other amounts due in connection with, any Senior Debt that then permits the holders of such Senior Debt to accelerate its maturity or the maturity of which has been accelerated.

(*Id.*)

The Prospectus then goes on to describe another remedy available to senior lenders for "any other event of default":

> In addition, during the continuance of any other event of default with respect to any Senior Debt pursuant to which the maturity thereof may be accelerated, upon (a) the receipt by the Trustee of written notice thereof from or on behalf of the Agent (or, at any time after all Senior Debt under the Senior Loan Agreement shall have been paid in full and such Senior Loan Agreement has been terminated, the holders of a majority of the principal amount of such Senior Debt) or (b) if such event of default results from the acceleration of the Debentures, the date of such acceleration, no such payment may be made by or on behalf of the Company or from its properties or any other source upon or in respect of the Debentures for a period (a "Payment Blockage Period") commencing on the date of receipt of such notice or the date of such acceleration and ending 120 days thereafter (unless such Payment Blockage Period shall be terminated by written notice to

the Trustee from the person commencing such Payment Blockage Period); *provided, however*, that in no event will a Payment Blockage Period extend beyond 120 days from the date the payment of the Debentures was due; and *provided, further, however*, that only one such Payment Blockage Period may be commenced during any period of 360 consecutive days.

(*Id.*)

This final provision is central to Plaintiffs' claims here. Plaintiffs emphasize that in the event Specialty defaulted under the Senior Loan Agreement *with respect to certain financial ratios*—(i.e., a "covenant default")—then GECC, as agent for the senior lender group, would be entitled to invoke a 120–day "Blocking Period" during which Specialty would withhold interest payments to the Debenture holders. (Amended Complaint ¶ 27.) Although the Prospectus does not expressly state what happens at the close of the 120–day period, Plaintiffs allege that the Prospectus fairly creates the inference that Specialty would then "be required to pay the delinquent principal and interest." (*Id.*) GECC was entitled to invoke only one such Blocking Period in "any 360–day period for any specific event of default." (*Id.*)

In addition to the provision for a 120–day Blocking Period, Plaintiffs allege, the Registration Statement and the Prospectus provide for only two other possible remedies available to the senior lenders in the event of default, whether for failure to make payments or to maintain prescribed financial ratios: the senior lenders could either require Specialty to sell assets in order to pay the delinquent principal and/or interest, or they could accelerate the total unpaid amount due. (*Id.* ¶ 28.) Additionally, the Registration Statement and the Prospectus stated that in the event of a default of principal payments to the senior lender group, the lenders would be entitled to an "additional 4% interest premium on the entire unpaid principal amount." (*Id.* ¶ 2(d).)

Plaintiffs allege that the Prospectus and Registration Statement are false, misleading and incomplete because they failed to mention other remedies available to the senior lenders. First, Plaintiffs assert, the offering documents do not disclose that, in the event of a financial covenant default, the senior lenders are authorized to control all cash and disbursements by the Company, including payments to the Debenture holders. (*Id.* ¶ 2(a).) Second, Plaintiffs assert that the Prospectus creates the false impression that after a 120–day suspension of payments on the Debentures, the Company must pay the unpaid principal and interest. (*Id.* ¶ 2(b).) Third, Plaintiffs assert that the documents fail to disclose that upon occurrence of a financial covenant default, the secured lenders have the power to suspend principal payments on the Senior Debt while, at the same time, to collect an additional 4% interest premium on the entire unpaid principal amount. This power actually enabled the minor lenders, in the event of a covenant default, to create a payment default, thus justifying an indefinite suspension of all payments to Debenture holders. (*Id.* ¶ 2(c) & (d).)

### The Defaults

Plaintiffs allege that the senior lenders exercised these undisclosed powers, to the Debenture holders' harm, in late 1990. On or about November 8, 1990, GECC notified the Company that Specialty was in default of § 6.3(c) of the Senior Loan Agreement regarding prescribed ratios of cash flow to fixed charges. GECC further notified the Company that, as of the end of the fiscal year on January 31, 1991, the Company would also be in default of various other financial ratios imposed by the Senior Loan Agreement. (*Id.* ¶ 29.) In response to Specialty's default, GECC, as agent for the senior lender group, invoked § 3.4 of the Senior Loan Agreement, thus effectively barring the Company from drawing on the $70 million revolving line of credit. (*Id.*) Specifically, in that letter, GECC notified the Company that it could draw on its Revolving Credit Loan only as follows:

Notwithstanding the foregoing, no Revolving Credit Loans will be made under the Agreement:

 (a) without the prior approval of the Agent [GECC]; or

(b) for the purpose of paying principal of or interest on Subordinated Debt [i.e. the Debentures]; or

(c) for the purpose of repaying the portion of principal of the Senior Term Loan due on December 1, 1990; or

(d) for the purpose of repaying principal of the Senior Term Loan after December 1, 1990 except to the extent that the Borrower's Gross Operating Margin (as indicated in the Borrower's monthly reports) for the 12 month period ending on the date of the most recent monthly report exceeds the sum of cash interest and Senior Term Loan principal actually paid by Borrower during such period plus $2 MM.

(*Id.*)

Because the Company did not segregate the cash it received from its operations from cash received from its Revolving Credit Loan, GECC's control of disbursements from the Revolving Credit Loan gave GECC effective control over all cash disbursements. (*Id.* ¶ 30.) GECC thus effectively suspended all payments to the Debenture holders. GECC explained these restrictions in a letter (the addressee of which is not specified) dated November 13, 1990. Specifically, the November 13 letter states: "[I]t should be perfectly clear that in light of the default under the Loan Agreement, the [senior lender] Group will not permit the Company to draw Revolving Credit Loans to make any payment in respect of Subordinated Indebtedness." (*Id.* ¶ 30.)

By letter dated November 14, 1990, GECC notified the Trustee of the Debentures that, as agent to the senior lenders, it was invoking a 120–day Blocking Period under § 1203 of the Trust Indenture for an Event of Default under § 6.3(c) of the Senior Loan Agreement. (*Id.* ¶ 31.) The 120–day Blocking Period was therefore scheduled to run until March 14, 1991. On November 15, Specialty announced publicly that it had been prevented by GECC from making the scheduled November 15, 1990 interest payment to the Debenture holders. (*Id.* ¶ 32.) The senior lenders, including GECC, however, continued to receive monthly interest payments, drawn in part from the Revolving Credit Facility. (*Id.* ¶ 33.) Under the Senior Loan Agreement, GECC unilaterally decided to suspend principal payments to the lenders after December 1, 1990. This suspension rendered GECC and the other senior lenders entitled, under provision 2.9(f) of the Senior Loan Agreement, to an additional 4% interest charge on the total unpaid balance of about $225,000,000 plus the used portion of the $70 million Revolving Credit Loan.[1] (*Id.* ¶ 34.)

On May 15, 1991, the day the next interest payment on the Debentures was due, Specialty refused to pay the delinquent interest payment of November 15, even though the 120–day Blocking Period expired March 15, 1991, and also refused to pay the current interest payment. (*Id.* ¶¶ 35(a) & (b).) Specialty attributed this refusal to pay to GECC's actions. Specifically, because Specialty was in default on principal payments to the senior lender group, GECC had suspended cash disbursements regarding payments for subordinated debts. (*Id.* ¶ 35(b).) As a result of these developments, Plaintiffs allege that the Debentures have become "virtually worthless." (*Id.* ¶ 40.)

## DISCUSSION

### *Analysis of Securities Fraud Claims*

Plaintiffs' five-count Amended Complaint charges Defendants with misrepresentations and omissions in the Registration Statement and Prospectus. In Count I, Plaintiffs allege that all Defendants have violated § 10(b) and § 20 of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission. Count II charges violation of § 11 of the Securities Act of 1933 on the part of Specialty; the underwriters, Kidder and PJH; the persons who signed the Registration Statement, i.e., Knoll, McKay, Gorychka, and Wangaard; and the directors, i.e., Gorychka, Greenwood, Wangaard, Robertson, and Ziols. In Count III, Plaintiffs allege violations of § 12(2) of the Securities Act of 1933 by the

---

1. Section 2.9(f) of the Senior Loan Agreement provides that if the Company fails to make any payment of principal or interest under the Senior Loan, the interest due is increased by 4%.

underwriters, Specialty, and the four individuals who signed the Registration Statement and prepared or signed and disseminated the Prospectus. Count IV charges all Defendants with common law fraud on the grounds that, with the intent to deceive Plaintiffs, they misrepresented material facts concerning both GECC's rights under the Senior Loan Agreement and Specialty's ability to pay interest and principal on the Debentures. Finally, in Count V, Plaintiffs allege that Defendants PJH and Kidder breached their duty of care to Plaintiffs "to prepare Specialty's prospectus and reports properly ... by negligently causing or permitting publication of untrue or incomplete statements concerning Specialty's ability to pay interest." (Amended Complaint ¶ 63–64.)

Defendant Kidder, Peabody & Co.; Defendant GECC; and Defendant officers and directors have moved to dismiss Plaintiffs' Amended Complaint pursuant to FED. R.CIV.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Kidder and the officers and directors of the Company argue that all the facts and circumstances that Plaintiffs claim were omitted or misrepresented were in fact disclosed in the offering documents. GECC incorporates this argument into its own motion to dismiss and asserts, further, that Plaintiffs' claims against it should be dismissed because GECC neither participated in nor controlled the sale of the Debentures. Additionally, GECC has moved to dismiss Plaintiffs' Amended Complaint pursuant to FED. R.CIV.P. 9(b) for failure to aver fraud with particularity.

A complaint may be dismissed for failure to state a claim only if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted). In considering a motion to dismiss, the court accepts all of the well-pleaded allegations of the complaint as true. *Roots Partnership v. Land's End, Inc.*, 965 F.2d 1411, 1416 (7th Cir.1992); *In re VMS Ltd. Partnership Secur. Litig.*, 803 F.Supp. 179, 183 (N.D.Ill.1992); *Reshal Assoc., Inc. v. Long Grove Trading Co.*, 754

F.Supp. 1226, 1229 (N.D.Ill.1990). Documents attached as exhibits to the complaint are part of the complaint for all purposes. FED.R.CIV.P. 10(c). Plaintiffs' allegations are assumed true for purposes of this motion; but facts that undermine Plaintiffs' claim need not be ignored, *Roots Partnership*, 965 F.2d at 1416. Nor is the court required to accept conclusory allegations when such allegations are contradicted by documents attached to and incorporated within the complaint. 5 Charles Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1327, at 766 (1990).

The disclosure required by the securities laws is measured not by the literal truth but by the ability of the material to inform accurately rather than to mislead prospective buyers. *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990) (central issue is not whether the statements taken separately were literally true but whether the statements taken "together and in context" would have misled a reasonable investor about the nature of the debentures), *cert. denied*, —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). Literally true facts may become misleading because of the manner in which they are presented. *Id.* At the same time, however, the securities laws are intended to encourage complete and careful *written* disclosure of material information. *Astor Chauffeured Limousine Co. v. Runnfeldt Invest. Corp.*, 910 F.2d 1540, 1545 (7th Cir.1990); *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1321 (7th Cir. 1988). Where the facts and circumstances allegedly omitted or misrepresented have actually been disclosed in the relevant transaction document, there will be no liability under the securities laws. *Acme Propane*, 844 F.2d at 1322–23.

### Plaintiffs' Misrepresentation Claims

Counts I through III of the Amended Complaint are federal securities law claims. Count I alleges violations by all Defendants of § 10(b) and § 20 of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated under that Act. Section 10(b), the general fraud provision of the Securities Exchange Act, prohibits any person from using

or employing "any manipulative or deceptive device" in connection with the sale of a security. 15 U.S.C. § 78j(b). Section 20 extends the potential liability to any "controlling person." 15 U.S.C. § 78t. Rule 10b–5 prohibits the making of "any untrue statement of a material fact or [failure] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a claim under section 10, Plaintiffs must allege that Defendants made material misstatements or omissions indicating an intent to deceive or defraud the purchasers of the Debentures, causing Plaintiffs to engage in a transaction resulting in loss. *Wright v. International Business Machs. Corp.*, 796 F.Supp. 1120, 1124 (N.D.Ill.1992) (citing *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989)).

Count II charges Specialty, the underwriters, and the officers and directors with violating § 11 of the Securities Act of 1933, 15 U.S.C. § 77k. Under that section, any signer, officer of the issuer, or underwriter may be held liable for offering materials that contain "an untrue statement of a material fact or omit[ ] to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The central inquiry in determining whether the Prospectus challenged here is materially misleading under either Section 10(b) or Section 11 is " 'whether defendants' representations, taken together and in context, would have [misled] a reasonable investor' about the nature of the investment." *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991) (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990), *cert. denied*, ─ U.S. ──, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991)).

Count III asserts that Specialty, the underwriters, and the signers of the Prospectus violated § 12(2) of the Securities Act of 1933. That section imposes liability on any person who "offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make

the statements, in the light of the circumstances under which they were made, not misleading...." 15 U.S.C. § 77l (2).

The question presented by Defendants' motions to dismiss is whether the Prospectus, considered as a whole, is misleading. *In re VMS Secur. Litig.*, 752 F.Supp. 1373, 1394–97 (N.D.Ill.1990); *McMahan & Co.*, 900 F.2d at 579. Plaintiffs allege that the Prospectus was materially misleading in three ways: It led them to believe that (1) the senior lenders had only two remedies upon a default by the Company—either acceleration of the total unpaid amount due or asset sale—but had no power to prohibit payment of interest on the Debentures (Amended Complaint, ¶ 28); (2) payment on the Debentures could not be suspended for a period longer than 120 days in any year period (*Id.* ¶ 37); and (3) Debenture holders could expect to receive payments drawn from the Revolving Credit Facility, which was funded by the senior lenders, even if payments were not being made on the senior indebtedness (*Id.* ¶ 26(b)). Although Plaintiffs' claims are related, the parties have addressed these alleged misrepresentations individually. These alleged misrepresentations are addressed separately below.

### 1. *Limitation of Remedies*

Plaintiffs first allege that the Prospectus gave investors the false impression that in the event of default the senior lenders had only two remedies available, acceleration of debt and forced asset sale. On Page 38, the Prospectus describes in some detail the financial covenants binding the Company, and provides that the senior lenders may direct the sale of assets for payment of Senior Debt. On page 39, the Prospectus identifies several types of default, including default in payment of the Senior Debt, breach of financial covenants, or default on the Debentures, and provides:

> Upon the occurrence of an event of default under the Senior Loan Agreement, the lenders may accelerate all amounts due under the Senior Term Loan and Revolving Credit Facility and/or exercise their rights to seize and sell collateral pledged by the Company as security.

Plaintiffs argue that, in light of these provisions, it was misleading for the Prospectus to omit a description of GECC's additional remedy: the power to terminate all Debenture payments indefinitely.

By describing only these two remedies, and by employing the expression "and/or," Plaintiffs argue, the Prospectus creates the false impression that no remedies were available to the senior lenders other than debt acceleration or forced asset sale. Defendants point out, however, that neither of the provisions states that acceleration of debt or forced asset sale are the *exclusive* remedies available to GECC. In fact, the Prospectus provides in several sections that in the event of default, the senior lenders have the additional power to prohibit Debenture payments. For example, the Prospectus provides in the section entitled "RISK FACTORS" on page 7 that in the event of a default with respect to the Debentures, senior lenders would be paid in full before Debenture holders and that, "(i)n addition, so long as a default exists in respect of Senior Debt, payment of interest on or principal of the Debentures may be prohibited." Similarly, on page 8, the Prospectus describes financial covenants binding the company and states:

> Failure to comply with any of these covenants would, as provided in the Senior Loan Agreement, permit the lenders under the Senior Term Loan and the Revolving Credit Facility to accelerate the maturity of the Senior Term Loan or the Revolving Credit Facility, preclude the payment of principal of or interest on the Debentures or both.

Moreover, the Prospectus explicitly addresses the Debentures' subordinate status to senior debt, explaining that so long as a default exists in the payment of Senior Debt that would permit acceleration of its maturity, no "direct or indirect" payment of interest could be made on the Debentures. (Prospectus, at 41.)

■ The Prospectus does identify in various places, therefore, a range of remedies available to the senior lenders in the event of default: suspension of payment to Debenture holders (page 7); acceleration of Senior Debt, preclusion of payment to Debenture holders "or both" (page 8); asset sale (page 38); acceleration of Senior Debt "and/or" asset sale (page 39); and preclusion of any interest payment on Debentures (page 41). Defendants have presented no explanation for the Prospectus drafters' decision to scatter the description of remedies throughout the document or to mention certain remedies, but not others, on particular pages. It is Plaintiffs' burden, however, to demonstrate that the offering materials, when read as a whole and in context, were materially misleading. Read as a whole, the Prospectus here does disclose that, in addition to accelerating the debt and forcing an asset sale, the senior lenders were entitled in the event of a default to suspend Debenture payments. Plaintiffs have not demonstrated that the Prospectus' failure to identify and describe all available remedies in one particular provision or section renders the document materially misleading.

### 2. *120–Day Blocking Period*

As their second challenge to the Prospectus, Plaintiffs allege that the document created the false impression that payments to Debenture holders could be suspended for only 120 days in the event of default in payment on the Senior Debt. Plaintiffs rely on the disclosure contained in the subsection entitled "Subordination." *See supra* at 1238–39. That section states first, as noted, that there would be no payments on the Debenture obligations so long as the Company was in default in payment on the Senior Debt. Plaintiffs contend, however, that a reasonable investor would understand such a suspension of payments to be qualified by language, which appears later in the same lengthy paragraph, that provides for a 120–day suspension of Debenture payments under certain circumstances.

■ Plaintiffs could not reasonably have believed that there were no circumstances under which payments on the Debentures could be suspended for more than 120 days. The "Subordination" section of the Prospectus does provide for a payment suspension limited to 120 days; a careful reading of that section demonstrates, however, that such a

limited suspension is the remedy for "any *other* event of default with respect to any Senior Debt"—that is, an event of default *other* than a default in payment. (Prospectus, at 41 (emphasis added).) Notably, the 120–day period was identified as a remedy "[i]n addition" to the complete prohibition of payments on the Debentures set forth in the previous sentence. In light of this language, it makes little sense to suggest, as Plaintiffs do, that the Prospectus' failure to set a time limit on the complete prohibition would lead a reasonable investor to conclude that the 120–day Blocking Period covers *all* defaults. As Defendants point out in their reply memorandum, "Time limits were not spelled out for the suspension of Debenture payments in the event of a payment default for a reason— there were none. As long as the payment default was not cured, Debenture payments could be suspended." (Officer and Director Defendants' and Kidder, Peabody's Reply Memorandum in Support of Their Motion to Dismiss, at 8.)

Again, read as a whole, the Prospectus amply discloses that the senior lenders were entitled to suspend Debenture payments indefinitely—not merely for 120 days—in the event of a default in payment of the Senior Debt.

### 3. *Control of Disbursements by Senior Lenders*

Much more difficult is Plaintiffs' third contention—that the Prospectus failed to disclose that, in the event of a covenant default, the Company's Revolving Credit Loan and operational cash flow would be subject to the unilateral control of the senior lenders, who could refuse to allow both sources to be used for Debenture payments. Plaintiffs assert that an investor unaware of the senior lenders' ability to control the Company's cash could be misled into believing that the Company would continue to pay scheduled Debenture payments out of its operating revenues even if GECC had frozen the Company's borrowing under the Revolving Credit Loan because of default.

The gravamen of this third claim may be stated simply: Language at page 38 of the Prospectus distinguishes between two ways

in which the Company might be in default on the Senior Loan—a payment default and a financial covenant default—and provides that, in the event of a financial covenant default, payments on the Debentures might be suspended for 120 days only. By utilizing powers not disclosed to investors, however, Defendant GECC was able to freeze payments on the Company's senior indebtedness. GECC's control of the Company's disbursements thus resulted in a *payment* default; the Company's default in payment on the Senior Debt permitted GECC to suspend Debenture payments indefinitely.

Defendants insist that the Prospectus does adequately disclose this power to suspend Debenture payments. They note that the Debentures' subordinate status is undisputed: the Company's obligation to pay on the Debentures was completely subordinate to payment of all Senior Debt in full. (*See* Prospectus, at 1, 7.) The Prospectus states explicitly that, in the event the Company failed to comply with the financial and operating covenants imposed on it by the Loan Agreement, the senior lenders were entitled "to accelerate the maturity of the Senior Term Loan *or the Revolving Credit Facility*, preclude the payment of principal of or interest on the Debentures *or both.*" (*Id.* at 8 (emphasis supplied).) The Prospectus does, thus, explain that ·breach of the financial covenants could result in acceleration of the Company's indebtedness under the Revolving Credit Facility. Once accelerated, that Facility could not be used to make payments of principal on the Senior Term Debt, let alone interest on the Debentures.

According to Defendants, if the description of a 120–day Blocking Period was misleading, it could not have materially misled the investors. The senior lenders' power to suspend payments from the Revolving Credit Facility was clearly disclosed on page 8 of the Prospectus. That Facility was itself part of the Company's senior debt. Plaintiffs knew at all times that their right to payment on the Debentures was completely subordinate to payment on the senior indebtedness. Even if Plaintiffs assumed that Debenture payments would resume, following the 120–day period, from operational cash flow, they could

not, consistent with the plain language of the Prospectus, have assumed that such payments would be made from the Revolving Credit Facility.

Plaintiffs urge that their assumption was a reasonable one. They recognize that the Prospectus discloses the senior lenders' power over the Revolving Credit Facility in the event of a covenant default, but argue that it did not disclose the senior lenders' power over the Company's operational cash flow. More importantly, Plaintiffs observe, the senior lenders' control over the Revolving Credit Facility and the Company's operational cash flow is not mentioned at all in the lengthy sections of the Prospectus describing the Senior Loan Agreement and the Debentures. Indeed, in the "Description of Debentures" section, the Prospectus carefully distinguishes between a default in payment on Senior Debt and a default on the Company's financial covenants; the Prospectus provides for a complete suspension on Debenture payments in the event of a payment default, but only a limited suspension in the event of a covenant default. This careful distinction between a payment default and a covenant default is rendered meaningless by the senior lenders' undisclosed power to control cash flow, prohibit payment of Senior Debt, and thus *create* a payment default where only a covenant default existed.

Plaintiffs have cited *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 in support of their argument that even literally accurate statements within a prospectus may be rendered misleading "through their context and manner of presentation...." *McMahan* involved an offering of subordinated debentures whose "key selling feature" was the right of debenture holders to tender the debentures to the issuing company in the event of a tender offer not approved by "a majority of the Independent Directors." *Id.* at 577, 578. Eighteen months after plaintiffs purchased the debentures, the issuer agreed to a merger that left the company heavily in debt; the company refused plaintiffs' tender of the debentures, however, on the ground that the " 'board of directors' had approved the merger." *Id.* Plaintiffs claimed that the debenture offering was materially misleading, but the district court concluded that defendants' statements regarding the right to tender debentures were literally true and granted summary judgment for defendants. Reversing, the Second Circuit concluded there was at least a genuine issue as to whether a reasonable investor might have been misled by the challenged statements to believe that the tender option was a meaningful protection available to investors and that the "Independent Directors" would exercise independent judgment on the investors' behalf.

According to the *McMahan* court, the disclosure required by federal securities law is "measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Id.* at 579. Although the Seventh Circuit has not precisely adopted this articulation of the disclosure requirement, it has intimated that written offering materials may be so lengthy that a particular statement is "too obscure to find," *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1323 (7th Cir.1988) (holding that a statement in a three-page document that arguably contradicted oral representations was *not* too obscure). Rule 12(b)(6) requires dismissal only if it appears beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

■ Here, language appearing in the "Description of Debentures" section near the end of a lengthy Prospectus distinguishes between defaults in payment on Senior Debt and defaults in maintaining certain financial ratios. The Prospectus provides for termination of payment on Debentures in the event of default in payment, but only a 120–day suspension in the event of covenant default. The very specificity of the language contained in that section suggests it may control over other, more general language providing broader remedies to the senior lenders. In this context, the drafters' failure to describe specifically the senior lenders' power to control cash disbursements in the event of a covenant default and to halt payments of principal on the Senior Debt—re-

sulting in a payment default—may support a conclusion that the Prospectus is materially misleading.

It may at least be said that under the circumstances presented here, the provision for a 120–day Blocking Period constitutes an "incomplete disclosure[ ] or half-truth[ ]" creating a duty to disclose "whatever additional information is necessary to rectify misleading statements." *See In re VMS Secur. Litig.*, 752 F.Supp. 1373, 1396 (N.D.Ill.1990). Defendants have not identified additional information which corrects the impression created by the "Description of Debentures" that the senior lenders' remedies for a covenant default were more limited than their remedies for a default in payment on Senior Debt. This court should deny Defendants' motions to dismiss Plaintiffs' claim that the Prospectus is materially misleading in this regard.

### Loss Causation

Although the issue was not addressed in any of Defendants' opening memoranda, Defendant Kidder raised the issue of "loss causation" in its reply memorandum in support of a motion to stay discovery pending this court's resolution of the motions to dismiss. At this court's request, Plaintiffs submitted a brief memorandum on the issue and Defendants jointly filed a response brief.

In *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990), the Seventh Circuit held that in order to state a claim under § 10(b) and Rule 10b–5, plaintiffs must allege not only the cause of their entering into the transaction in which they lost money (a concept referred to as "transaction causation"), but also "the cause of the transaction's turning out to be a losing one"—that is, "loss causation." Plaintiffs in *Bastian* alleged that, by means of misrepresentations, defendants had induced them to invest in oil and gas ventures in 1981 that were worthless three years later. Noting that oil and gas prices had declined steadily after 1981, the court concluded that these allegations were not sufficient to support the conclusion that defendants' misrepresentations were the cause of plaintiffs' loss. More recently, the Seventh Circuit has explained that it is not enough for plaintiff to assert that the alleged misrepresentations caused him to buy the securities; plaintiff must also allege "that the misstatement caused him to incur the loss of which he complains. . . ." *Pommer v. Medtest Corp.*, 961 F.2d 620, 628 (7th Cir.1992). Defendants here argue that Plaintiffs fail to so allege.

Plaintiffs respond that they did adequately plead loss causation in paragraph 42(a) of the Amended Complaint, in which they allege that "Defendants' scheme, including misstatements and omissions in the Registration Statement and Prospectus, affected the decision-making of investors so that the price of Specialty's Debentures was vastly inflated during the period when members of the Class were purchasing their securities." In addition to this allegation, which Plaintiffs concede is "conclusory" (Plaintiffs' Memorandum Addressed to the Issue of Loss Causation, at 5), Plaintiffs assert that GECC's decision to suspend the first interest payment in November 1990 caused a precipitous decline in the value of the Debentures and that there is "no evidence or allegation" that the Company could not have made payments on the Debentures.

As Defendants point out, Plaintiffs cannot rely here on allegations that appear only in their briefing. Moreover, even if Plaintiffs' additional assertion—that there is no evidence the Company's finances were compromised—did appear in the complaint, a serious questions remains as to whether those allegations would be adequate. First, Defendants bear no burden to allege, let alone produce evidence of, the insufficiency of the Company's cash flow to pay interest and principal on the Debentures as well as the Senior Debt at the time that Debenture payments were suspended. Instead, Plaintiffs must plead and prove that they suffered loss as a result of Defendants' material misrepresentation—as one court put it, "that they would not have suffered a loss on their investment if the facts were as they believed them to be at the time they purchased the securities," *In re VMS Secur. Litig.*, 752 F.Supp. 1373, 1399 (N.D.Ill.1990)—and not merely that Defendants violated the terms of the Prospectus. Plaintiffs have failed to make any allegation that would support the

inference that they would not have suffered loss if the facts were as they understood them to be at the time of purchase.

Indeed, the "RISK FACTORS" section of the Prospectus defeats any such suggestion. (Prospectus, at 7–9.) That section plainly discloses that there was "no assurance" that operational cash flow would be sufficient to meet debt service obligations. The section also states that the Company's failure to comply with "financial and operating covenants" would permit the senior lenders to accelerate the maturity of the Revolving Credit Facility and prohibit any payments on the Debentures. (*Id.* at 7.) Plaintiffs have not alleged that the Company was in fact in compliance with the covenants.

The other circumstance on which Plaintiffs rely—the alleged precipitous decline in the value of the Debentures—actually undermines the claim of loss causation here. Plaintiffs do not contest the senior lenders' plainly-disclosed right to suspend payment on the Debentures for 120 days in the event of a default on the financial covenants. A precipitous decline in the value of the Debentures at the time that fully-disclosed right was exercised indicates strongly that Plaintiffs' loss resulted from GECC's legitimate public announcement of a covenant default, rather than from any action GECC subsequently took to prohibit payment on the senior loan.

*Bruschi v. Brown,* 876 F.2d 1526 (11th Cir.1989), does not call this conclusion into question. In *Bruschi,* the Eleventh Circuit concluded that loss causation is adequately alleged where plaintiff asserts that defendant induced her to enter into a risky transaction by misrepresenting the transaction as safe and that plaintiff "suffers a loss resulting from the risky nature of the investment." 876 F.2d at 1531. The *Bastian* court distinguished *Bruschi* on the ground that the oil and gas investors in *Bastian* were not told that their investments were risk-free. Similarly, here, Plaintiffs have not alleged that the Prospectus represented the Debentures as risk-free; not have Plaintiffs alleged facts supporting a conclusion that the loss they experienced was a function of a risk of which they were unaware. Instead, as discussed above, it was the Company's default which resulted in the Debentures' market value plummeting.

■ The circumstances here are similar to those before the Second Circuit in *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495–96 (2nd Cir.1992). In *Citibank,* plaintiff bank had loaned money to a company for purchase of aerospace subsidiaries, relying in part on the willingness of the company's sole stockholder to make a large equity contribution. When the company defaulted on its loan, plaintiff learned that defendant, the seller of the subsidiaries, had concealed from plaintiff the fact that the stockholder had substituted a promissory note for a portion of the cash contribution. The Second Circuit affirmed dismissal of the bank's § 10(b) claim. The court reasoned that the cause of plaintiff's loss was borrower's default on the loan; defendant's failure to disclose the additional loan it had made to borrower's principal would support a finding of transaction causation, the court reasoned, but not loss causation. The *Citibank* court cited the Seventh Circuit's decision in *Bastian* in support of this conclusion. *Id.* at 1495. Here, similarly, the apparent cause of loss to Plaintiffs, who were subordinated to the senior lenders, was Specialty's failure to meet its financial obligations, not Defendants' exercise of an allegedly undisclosed remedy.

■ Plaintiffs' failure to plead loss causation requires dismissal of their claims under § 10(b) (Count I) and their common law fraud claims (Count IV). The parties' memoranda limit their discussion of the loss causation requirement to Plaintiffs' § 10(b) claim. It appears well-settled that loss causation is not a requirement of a cause of action under § 11; instead, absence of loss causation is an explicit defense to a § 11 claim, *see Bastian v. Petren Resources Corp.,* 892 F.2d 680, 685 (7th Cir.1990); *Lyne v. Arthur Andersen & Co.,* 772 F.Supp. 1064, 1067 (N.D.Ill.1991). Accordingly, Plaintiffs' failure to plead loss causation does not require dismissal of Count II.

There is some support in this district, however, for imposing such a requirement on claims under § 12(2). *See Scholes v. Schroe-*

*der*, 744 F.Supp. 1419, 1423–24 (N.D.Ill.1990); *Xerox Financial Servs. Life Ins. Co. v. Salomon Bros., Inc.*, No. 92 C 1767, 1992 WL 151923, at *6 (N.D.Ill. June 18, 1992); *Robin v. Falbo*, No. 91 C 2894, 1992 WL 188429, at *1 n. 2 (N.D.Ill. July 24, 1992). *But see Caviness v. Durand Resources Corp.*, 983 F.2d 1295, 1304–05 (4th Cir.1993); *American Federation of State, County and Municipal Employees v. Federal Deposit Ins. Corp.*, 813 F.Supp. 7, 19 (D.D.C.1992); *cf. Pommer v. Medtest Corp.*, 961 F.2d 620, 628 (7th Cir. 1992) (distinguishing § 10(b) measure of damages from appropriate measure of damages under §§ 11 and 12 and referring to the § 10(b) measure as principle of loss causation). Because the parties have not briefed the issue, however, dismissal of Count III on this ground would not be appropriate.

### Reliance on Offering Materials Other Than the Prospectus

In their original motions to dismiss, Defendants Specialty and SPE Acquisition relied on the Registration Statement and Senior Loan Agreement in support of their argument that the offering materials were not materially misleading as a matter of law. The District Court denied that motion on grounds that it relied on matters outside the scope of the Amended Complaint and the Prospectus, attached as an exhibit to the Amended Complaint. Prior to their bankruptcy filing, Defendants Specialty and SPE Acquisition sought reconsideration of that ruling. Significant authorities do support the conclusion that Defendants may fairly rely on other offering materials in support of a motion to dismiss a securities fraud claim.

As Defendants note, Plaintiffs' Amended Complaint refers frequently to the Registration Statement.[2] In *Mancini v. Prudential–Bache/Fogelman Harbour Town Properties*, No. 90 C 5213, 1991 WL 171966 (N.D.Ill. Sept. 3, 1991), plaintiffs, investors in a real estate limited partnership, alleged that defendants' offering materials contained misrepresentations and omissions. Despite frequent references to those offering materials, plaintiffs failed to attach any of them to their complaint. When defendants submitted the offering materials as exhibits to their motion

to dismiss, plaintiffs argued that the court must disregard the materials or convert the motion to dismiss to a motion for summary judgment. Citing 5 Charles Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE, § 1327, at 762–63 (1990), Judge Plunkett of this court reasoned, however, that where plaintiffs made "copious reference" to the pertinent offering materials, those materials might properly be considered in support of defendants' motion. 1991 WL 171966, at *12.

Chief Judge Moran reached a similar result in *In re First Chicago Corp. Secur. Litig.*, 769 F.Supp. 1444 (N.D.Ill.1991), in which plaintiff charged a bank with violations of federal securities laws. Ordinarily, the court observed, in deciding a motion to dismiss under Rule 12(b)(6), the court is restricted to considering allegations of the complaint and must treat the motion as one for summary judgment if matters outside the pleading are considered. Exhibits to the complaint are considered for all purposes, however, and "pertinent documents that a plaintiff fails to append to his complaint but that a defendant attaches to his motion to dismiss will be treated similarly." *Id.* at 1450. In support, *In re First Chicago* cites Wright and Miller and decisions from two Courts of Appeals, *Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988) ("In determining whether [securities fraud] claims were properly dismissed under Rule 12(b)(6), we may of course refer to the Offer to Purchase and the 1984 Proxy Statement, which were annexed to defendants' motion to dismiss and are documents that are integral to plaintiff's claims"), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); and *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988).

More recently, in *Kramer v. Time Warner Inc.*, 937 F.2d 767 (2nd Cir.1991), the court concluded that documents required by law to be filed with the Securities Exchange Commission may be considered on a motion to dismiss even if such documents were not attached to the complaint. Otherwise, the

---

**2.** *See* Amended Complaint, ¶ 2(a), 2(b), 2(c), 2(d), 26(a), 26(b), 27, 28, 37, 28, 42, 48(a), and 48(b).

court reasoned, "complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure." *Id.* at 774. *See also I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (considering disclosures in challenged prospectus, in spite of plaintiff's failure to attach prospectus to the complaint); *Teagardener v. Republic–Franklin Inc. Pension Plan,* 909 F.2d 947, 949 (6th Cir.1990) (reference to document was permissible where language of document and meaning of its terms were central to plaintiffs' complaint), *cert. denied,* 498 U.S. 1027, 111 S.Ct. 678, 112 L.Ed.2d 670 (1991); *In re VMS Secur. Litig.,* 752 F.Supp. 1373, 1394 n. 21 (N.D.Ill.1990) ("when plaintiffs fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading"); *In re Bally Mfg. Secur. Corp. Litig.,* 141 F.R.D. 262, 265 n. 2 (N.D.Ill.1992) (same).

■ These authorities support the conclusion that Defendants may fairly rely on disclosures contained in the Registration Statement and Senior Loan Agreement in support of their argument that Plaintiffs' securities fraud claims should be dismissed. In light of the current procedural posture, however, this Report takes no position on any additional arguments based upon either the Registration Statement or the Senior Loan Agreement. Notably, however, Plaintiffs have not explicitly challenged Defendants' assertions that the Senior Loan Agreement in fact discloses information that Plaintiffs claim has been withheld.

### CONCLUSION

Defendants have not demonstrated that Plaintiffs can establish no set of facts which would entitle them to relief on their securities fraud claims. Specifically, Plaintiffs have adequately pleaded that the Prospectus was materially misleading because it failed to explain that the senior lenders could, in the event of a covenant default, control the Company's cash flow and create a payment default. Plaintiffs have not, however, adequately pleaded loss causation. Accordingly,

Plaintiffs' § 10(b) claim (Count I) and their common law fraud claim (Count IV) should be dismissed. Although Plaintiffs' § 11 claim (Count II) is clearly not subject to a requirement that loss causation be pleaded, their § 12(2) claim (Count III) may be subject to such a requirement. Because no party has briefed this question, however, dismissal of Count III on this ground would not be appropriate. Similarly, beyond their arguments concerning whether the Prospectus is materially misleading, the parties have not addressed Plaintiffs' state law claim for negligent misrepresentation, asserted against Defendant underwriters (Count V). Because such a claim would also appear to be subject to a requirement of pleading "loss causation," however, Count V should also be dismissed. The court may in its discretion grant Plaintiffs leave to file an amended complaint.

Date: February 26, 1993

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable George W. Lindberg. *See* FED.R.CIV.P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut General Life Ins. Co.,* 900 F.2d 1032, 1039 (7th Cir.1990).

On Motion For Limited Reconsideration

### *REPORT AND RECOMMENDATION*

Aug. 6, 1993.

PALLMEYER, United States Magistrate Judge.

Plaintiffs Melvin C. Nielsen and Peter C. Kostantacos ("Plaintiffs") brought this securities fraud class action against Defendants Specialty Equipment Companies, Inc. ("Specialty") and SPE Acquisition, Inc. ("SPE Acquisition"), issuers of subordinated debentures purchased by Plaintiffs; Kidder, Peabody & Co. and Piper, Jaffray & Hopwood, Inc., underwriters of the debentures; General Electric Capital Corporation ("GECC"), senior lender to the issuers; and the officers and directors of Specialty. Defendants Specialty and SPE Acquisition sought bankruptcy protection, and defendant Piper, Jaffray, & Hopwood moved to compel arbitration.

**1250**

The remaining Defendants filed separate motions to dismiss the complaint for failure to state a claim. On February 26, 1993, this court issued a Report and Recommendation ("R & R") recommending that Defendants' motions to dismiss be granted in part and denied in part. The R & R concluded, in part, that Plaintiffs had failed adequately to plead loss causation, an element of a cause of action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); accordingly, the R & R recommended that Count I of the complaint (Plaintiffs' § 10(b) count) be dismissed. The R & R observed, further, that some courts in this district appear to recognize loss causation as an element of a cause of action under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2). As none of the parties had briefed the issue, however, this court declined to address the question whether Plaintiff's failure to allege loss causation requires dismissal of Count III (Plaintiffs' § 12(2) count). Upon a Motion for Limited Reconsideration filed with leave of court by Defendants Kidder, Peabody & Co. and the officers of Specialty ("Defendants"), this unaddressed issue is now before the court.

### FACTUAL BACKGROUND

The facts of this matter are more fully presented in the court's original Report and Recommendation. (R & R, at 2–14.) This Report assumes the reader's familiarity with the earlier R & R and will summarize the relevant facts here only briefly.

In order to repay the loan that SPE Acquisition had obtained to finance its purchase of Specialty, Specialty issued $150 million of subordinated debentures and offered them for sale to the public pursuant to a Prospectus and Registration Statement dated November 15, 1988. (Amended Complaint ¶ 25(a)–(b).) In November 1988 and February 1990, Plaintiffs purchased $150,000 of the subordinated debentures. After Specialty suspended payments on the debentures in November 1990, Plaintiffs filed this class action. (*Id.* ¶¶ 6, 30(b).) Plaintiffs alleged, among other things, that Defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934 (Counts I, II, and III)

by misrepresenting powers of the senior lender, GECC, to control the debenture payments. (*See id.* ¶¶ 41–57.)

The Prospectus issued in conjunction with the debentures describes in detail the subordinated position of the debenture holders in relation to GECC. In the event that Specialty defaulted on a loan payment, the Prospectus allows GECC to suspend the debenture payments indefinitely. In contrast, in the event of a covenant breach—a breach of Specialty's promise to maintain certain cash-flow ratios—the Prospectus permits GECC to suspend payment on the debentures for a 120–day period. (*Id.* ¶ 27.) According to Plaintiffs' reading of the Prospectus, the payments on the debentures should resume after the 120–day period unless there has been further default. (*Id.*) When Specialty, did default on its financial covenant in November 1990, however, GECC exercised a power Plaintiffs contend was not disclosed—to suspend Specialty's payment of the senior loan, thus causing a payment default. (*Id.* ¶ 35(b).) In accordance with provisions in the Prospectus for a payment default, GECC was then able to suspend payments on the debentures indefinitely. (*Id.*) This court's earlier R & R concluded that Plaintiffs had adequately pleaded that the Prospectus was materially misleading because it failed to explain that the senior lenders could, in the event of a covenant default, control Specialty's cash flow and create a payment default.

Although this court found that Plaintiffs had alleged an adequate basis for a securities fraud claim, the R & R recommended dismissal of Count I (securities fraud claim brought under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5) based upon Plaintiffs' failure to plead "loss causation." (R & R, at 31.) "Loss causation" refers to the concept—which the Seventh Circuit has required investors to prove in a § 10(b) action—that the alleged misrepresentations in the securities offering specifically caused the loss that plaintiff suffered. *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). As more fully discussed in the earlier R & R, although Plaintiffs established that Defendants made

misleading statements in the Prospectus, Plaintiffs failed to plead directly or to allege facts creating an inference that the misrepresentations contained in Defendants' Prospectus caused Plaintiffs' ultimate loss. (R & R, at 27–31.)

The sole question now before this court is whether Count III—in which Plaintiffs allege violations of § 12(2) of the Securities Act of 1933 by the underwriters, Specialty, and the four individuals who signed the Registration Statement and prepared or signed and disseminated the Prospectus—should also be dismissed for Plaintiffs' failure to allege "loss causation." [1]

### DISCUSSION

Congress passed the Securities Act of 1933, including § 12(2), to protect investors in securities by requiring sellers "to make full and fair disclosure of the character of securities sold in interstate and foreign commerce...." *Pacific Dunlop Holdings Inc. v. Allen & Co.*, 993 F.2d 578, 581 (7th Cir. 1993) (quoting *Wilko v. Swan*, 346 U.S. 427, 430–31, 74 S.Ct. 182, 184, 98 L.Ed. 168 (1953)). Specifically, § 12(2) imposes liability on any person who "offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading...." 15 U.S.C. § 77*l* (2). Thus, § 12(2) is more narrowly focused than § 10(b) of the Securities Exchange Act of 1934, which imposes liability on any person who "use[s] or employ[s], in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j (b). Under Section 10(b), plaintiffs must plead that their loss would not have occurred

if the facts presented in the offering materials for a securities issue were true, or that defendants' untrue statements caused their loss. *See Bastian*, 892 F.2d at 684. Defendants here contend that Plaintiffs' failure to plead loss causation requires dismissal of the § 12(2) claim (Count III of the Amended Complaint), as well.

### *"Loss Causation" Distinguished from "Transaction Causation"*

The term "loss causation" is commonly confused with "transaction causation," another element which an investor is required to prove under § 10(b) and Rule 10b–5. A plaintiff may establish transaction causation by showing that he would not have engaged in a transaction had the other party made truthful statements at the time required. Loss causation, by contrast, requires an investor to show that he or she would not have suffered a loss if the facts were as he or she believed them to be. *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988), *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 814 F.Supp. 720, 727 (N.D.Ill.1993).[2]

At least some authorities cited by Plaintiffs neglect this distinction. For example, Plaintiffs cite *Sanders v. John Nuveen & Co.*, 619 F.2d 1222 (7th Cir.1980), *cert. denied*, 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981), a Seventh Circuit case decided before the phrase "loss causation" was widely used in securities law. (Plaintiffs' Opposition, at 2–3.) *Sanders* was a class action brought by purchasers of short-term promissory notes against the underwriter of the notes. 619 F.2d at 1224. The underwriter failed to make a reasonable investigation of the company that issued the notes, failed to discover that company's true financial status, and, as

---

1. Although this court recognizes that Plaintiffs object to the conclusion reached earlier that they failed adequately to plead loss causation, the court will adhere to that conclusion for the purposes of this Motion for Limited Reconsideration. *See* discussion, *infra*, at 1252.

2. Plaintiffs may confuse the two terms when they quote an excerpt from a securities regulation treatise stating that "legislative history also argues against reading something like a reliance

(or causation) requirement into the statutory reference to a sale 'by means of' a misleading prospectus or oral communication." 9 Louis Loss & Joel Seligman, Securities Regulation 4203 (1991) (footnote omitted). The authors' parenthetical reference to 'causation' in this excerpt appears to address not loss causation but rather transaction causation—the situation where a buyer *relies* on a misrepresentation in making a purchase, and the misrepresentation *causes* that transaction.

a result, issued a deceptive prospectus. *Id.* Defendants argued that there was no showing of causation linking the alleged misrepresentations with the purchases to support a § 12(2) claim because some of the plaintiffs had never received the misleading prospectus. *Id.* at 1225. Responding to this contention, the court adopted a broad definition of causation under which plaintiffs were allowed to proceed. Alluding to legislative history, the court explained that a misrepresented security will invariably have an over-inflated market price because its price is established with reference to comparable securities on the market. A buyer purchases the security at this false price, whether or not he or she is aware of the representations in the prospectus. *Id.* at 1226.

The language of *Sanders,* in which the court speaks of a "causal connection between the misleading representation or omission and plaintiff's purchase" and analyzes the "offers or sells a security ... by means of" wording in § 12(2) suggests *Sanders* was addressing transaction causation and not loss causation. *Id.* at 1225. Notably, however, *Sanders* provides an example of a frequently-occurring situation in which the same misrepresentation caused both the transaction and the loss.[3] This case differs significantly. Plaintiffs have offered no rationale supporting the notion that, had Defendants disclosed GECC's additional powers in the Prospectus, the market price of the debentures would have changed significantly. Even apart from GECC's allegedly undisclosed power, GECC retained the fully-disclosed power to take near-total control over the debenture payments in the case of a default. Under these circumstances, disclosure of GECC's true total control could not have had a great effect on the value of the debentures. Although *Sanders* presents a broad interpretation of causation that would support Plaintiffs' claim, the fact pattern to which the supporting analysis applies is significantly different from

that of the present case and, thus, provides little support for either party here.

### Case Law in this Circuit and District

 The parties disagree over whether case law from this circuit requires a plaintiff to plead "loss causation" as an element of his cause of action under § 12(2). Defendants rely on the same cases cited by this court in its earlier R & R. Plaintiffs point out, however, that those decisions from this circuit that *do* suggest that loss causation is a pleading requirement for a § 12(2) claim provide no extensive explanation for that conclusion. In *Robin v. Falbo,* No. 91 C 2894, 1992 WL 188429 (N.D.Ill. July 24, 1992), for example, plaintiffs sued defendant real estate developer under § 10(b), Rule 10b–5, and § 12(2) of the federal securities laws, alleging that defendant induced them to buy securities by means of misleading statements about the financial condition of the development partnership. Some time after the original purchase, the development partnership began operating at a loss and plaintiffs' securities dropped in value. *Id.* at *1. Plaintiffs alleged that the misrepresentations caused them to enter the transaction, but failed to allege that the misrepresentations caused their loss. The court stated that plaintiff needed to allege both loss causation and transaction causation for claims under § 10(b) and Rule 10b–5, and then went on to apply this requirement to § 12(2) without any explanation or recognition of the differences between the two sections. *Id.* at *1–2.

In *Xerox Fin. Servs. Life Ins. Co. v. Salomon Bros., Inc.,* No. 92 C 1767, 1992 WL 151923 (N.D.Ill. June 18, 1992), similarly, the court offered little explanation in requiring plaintiffs to plead loss causation as part of their § 12(2) claim. Plaintiffs in *Xerox* had invested in an economy-hotel company that eventually went into debt. *Id.* at *1. After their investment went bad, plaintiffs brought

---

**3.** Another commentator has suggested that this very phenomenon explains the frequent confusion between loss causation and transaction causation:

> The issue of causation in fact has two aspects often obscured by the fact that the same misrepresentation is a substantial factor in both

loss causation and transaction causation. Thus, a false representation by *A* to *B* relating to the value of a security *A* sells to *B* can readily be established to be a substantial factor in (1) inducing *B* to enter into the transaction and (2) causing *B*'s loss.

3B Harold S. Bloomenthal, Securities and Federal Corporate Law § 9.07[1], at 9–60 (1991).

suit against the issuer of the securities, charging that it had misrepresented the declining financial status of the company and the fee arrangements between the company and the issuer. *Id.* at \*2. Plaintiffs did not allege loss causation. Citing only to *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir.), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990), the court stated that plaintiffs were required to allege loss causation as part of a § 12(2) claim. 1992 WL 151923, at \*6.

The *Bastian* decision does not support a requirement of loss causation under § 12(2), however. In *Bastian,* in fact, the Seventh Circuit specifically recognized that § 12(2) differs from § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, for which loss causation is a necessary element:

> If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them [under § 10(b) ] would be a windfall. Other sections of the securities laws, such as section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*, permit windfall recoveries, .... [P]roof of loss causation has been held to be required in *some* actions under section 12(2), *Wilson v. Ruffa & Hanover, P.C., supra,* 844 F.2d [81] at 85–86, [ (2d Cir.1988) ], ....

892 F.2d at 684–85 (emphasis added). Thus, the *Bastian* court observed, if defendants' *misrepresentation did not cause plaintiffs'* loss, then to award plaintiffs damages under § 10(b) would be a windfall. But § 12(2) permits windfall recovery—it permits a plaintiff to recover without any showing of loss causation.

The *Bastian* court cited to *Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81 (2d Cir.1988), *vacated on reargument, sub nom. Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124 (2d Cir.1989), as support for the

notion that loss causation may be required in some § 12(2) cases. In *Wilson v. Ruffa,* the Second Circuit held that while loss causation is not required when defendants directly sell securities, it is required when defendants are nonselling collateral participants in a securities transaction. 844 F.2d at 86. In that case, defendant law firm prepared and delivered a misleading prospectus, but did not sell or underwrite the securities in question. *Id.* at 82–83. The Second Circuit held that plaintiff was required to show loss causation to support a § 12(2) claim because defendant was a collateral participant rather than a direct seller. *Id.* at 86.

As Plaintiffs here point out (Plaintiffs' Opposition, at 4 n. 2), the Second Circuit subsequently reconsidered its *Wilson* decision in light of the Supreme Court's opinion in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).[4] On reconsideration, the Second Circuit reached the same result, but abandoned the nonselling collateral participant/direct seller distinction respecting loss causation pleading requirement. Following *Pinter,* the Second Circuit concluded that § 12(2) only applied, without a need to show loss causation, to direct sellers—collateral participants were not liable for § 12(2) violations at all. *Wilson v. Saintine,* 872 F.2d at 1126–27. The Second Circuit held that defendant law firm could not be held liable under § 12(2) because the law firm did not solicit the sale of the securities. *Id.* at 1127. In the present case, Defendants are direct sellers.[5] The Second Circuit analysis (cited with approval in *Bastian*) thus suggests that an allegation of loss causation should not be required for a § 12(2) claim.

The court in *Scholes v. Schroeder,* 744 F.Supp. 1419, 1423–24 (N.D.Ill.1990), also relied on the *Bastian* decision. *Scholes* is also distinguishable, however, because it involved

---

4. In *Pinter v. Dahl,* the Supreme Court held that primary liability under § 12(1), 15 U.S.C. § 77*l*(1), extends only to persons who solicit the sale of securities, not collateral participants in an unlawful securities transaction. Because the language of § 12(1) interpreted by the Court in *Pinter* ("[a]ny person who ... offers or sells a security") is identical to language in § 12(2), courts have concluded that the class of persons who may be held liable under § 12(2) should likewise be limited to direct sellers. *See Acker-*

*man v. Schwartz,* 947 F.2d 841, 844 (7th Cir. 1991); *Dalton v. Alston & Bird,* 741 F.Supp. 1322, 1331 (S.D.Ill.1990).

5. Plaintiffs allege that Defendants were sellers or that they played a part in the sale of the debentures. (Amended Complaint ¶ 55.) Defendants do not contest these allegations, and they are assumed true here.

a § 12(2) suit brought by the court-appointed receiver of a securities dealer against other sellers who allegedly participated with the dealer in his fraud. *Id.* at 1420. Scholes claimed that the receivership entities he represented had sold the securities in reliance on misrepresentations made by defendants, the other sellers. Recognizing that defendants' wrongdoing had actually enriched the receivership estates, the court dismissed Scholes' § 12(2) claim, explaining that "it is incumbent on Scholes to explain how the seller of securities can make such a 1933 Act § 12(2) claim ... in light of the principles of loss causation stated in *Bastian v. Petren Resources Corp.*" *Id.* at 1423–24 (citations omitted). Because this was a unique situation of a seller (through its receiver) bringing suit instead of a buyer, the court directed that Scholes address and explain his standing to seek recovery against others with whom the architect of the fraud structure had conspired. The *Scholes* court did not specifically hold that loss causation is a requirement of § 12(2), and does not weigh in favor of or against including loss causation in a § 12(2) claim.

Defendants correctly assert that the support for Plaintiffs' position provided by *Pommer v. Medtest Corp.*, 961 F.2d 620 (7th Cir.1992), is *dicta.* (Defendants' Reply, at 4–5.) Plaintiffs in *Pommer* brought a fraud claim under § 10(b) and Rule 10b–5, not under § 12(2). 961 F.2d at 622. *Pommer* does suggest a rationale supporting Plaintiffs' position, however. In discussing damages under the federal securities acts, the *Pommer* court observed that while § 12(2) uses the same starting point for damages as does § 10(b), it "also allow[s] the defendant to *reduce* the award by demonstrating that the misstatement did not cause the decline in value." *Id.* at 628 (emphasis added). By recognizing that a plaintiff may recover *some* damages even if the misstatement was not the cause of loss, the court implies that plaintiff may have a cause of action even without loss causation. *Id.; see also Ackerman v. Schwartz,* 947 F.2d 841, 845 (7th Cir.1991) (distinguishing § 12 claims from other securities fraud claims and noting that "[m]issing [in § 12] is any reference to causation and contribution".) Further, at least one court in

this district has expressly distinguished § 12(2) from § 10(b) as *not* requiring a showing of loss causation. *Coe v. Nat'l Safety Assocs., Inc.,* 137 F.R.D. 252, 254 (N.D.Ill. 1991).

Defendants here argue that a plaintiff who shows no loss causation under *Pommer* will have no claim because the damages would be mitigated to nothing. (Defendants' Reply, at 5.) That argument addresses only the issue of damages, however, a matter quite distinct from that of liability. *Pommer* thus does lend support for the argument that there may be liability under § 12(2) without loss causation and that the absence of loss causation will be relevant only to the damages award.

### Case Law in Other Circuits

Addressing the question more directly, courts in two other circuits have held that a plaintiff is not required to plead loss causation in order to state a claim under § 12(2): "Statutory sellers 'may now be liable under section 12 whether or not scienter or loss causation is shown.'" *Polycast Technology Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244, 259 (S.D.N.Y.1992) (quoting *Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989)). More recently, the Fourth Circuit held that neither loss causation nor transaction causation is a required element of a claim under § 12(2): "A claim under § 12(2) may be grounded on untrue statements and omissions that make a memorandum misleading, whether or not the plaintiff relied on the memorandum or even read it, and may justify rescission, whether or not the plaintiff was damaged." *Caviness v. Derand Resources Corp.,* 983 F.2d 1295, 1305 (4th Cir.1993). In *Caviness,* plaintiffs invested in oil and gas wells managed by defendants. *Id.* at 1298. Dissatisfied with the returns on their investment and seeking rescission, plaintiffs claimed that defendants' private placement memoranda on which they relied to make their investment decisions were misleading because of untrue statements and omissions. *Id.* at 1298–99, 1304. The court held that plaintiffs had stated a valid claim for rescission of a sale of a security under § 12(2), even though plaintiffs' com-

plaint made no allegation that the misleading statements caused their loss. *Id.* at 1305.

Authority from outside this Circuit thus suggests that Plaintiff may challenge the deceptive statements in the Prospectus, even without demonstrating that the misstatements caused their loss.[6]

### Policy Considerations

Defendants raise some policy arguments in support of their position that § 12(2) requires a showing of loss causation. They urge that § 12(2) was not intended to provide investors with an "insurance policy against nonspecific risks and losses." (Defendants' Reply, at 2–3.) As the Supreme Court has recognized, however, while Congress certainly did not enact the Securities Act of 1933 as an insurance policy, the Act may have precisely this incidental effect in its legitimate application:

> We may therefore infer that Congress chose a rescissory remedy when it enacted § 12(2) in order to deter prospectus fraud and encourage full disclosure as well as to make investors whole. Indeed, by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud.

*Randall v. Loftsgaarden,* 478 U.S. 647, 659, 106 S.Ct. 3143, 3151, 92 L.Ed.2d 525 (1986).[7] The Second Circuit echoes this interpretation: "In drafting Section 12(2), Congress obviously sought to provide a heightened deterrent against *sellers* who make misrepresentations, by rendering tainted transactions voidable at the option of the defrauded purchaser regardless of whether the loss is due to the fraud or to a general market decline." *Wilson v. Ruffa,* 844 F.2d at 86.

By providing a heightened deterrent, Section 12(2) may appear to function as an "insurance policy," but such an appearance is incidental to the legitimate goal of deterring misrepresentations. Another related incidental effect of this heightened deterrent is that windfall awards may be bestowed upon plaintiffs whose loss was not caused by defendants' misrepresentations; as the Seventh Circuit has already recognized, however, such windfalls may be a permissible result under § 12(2). *See Bastian,* 892 F.2d at 685. The fact that Plaintiffs' securities underwent a severe decline in market value not caused by the misrepresentation itself need not preclude an award of damages under § 12(2).

Defendants suggest that the purpose of § 12(2), "to prevent the price of a security from being artificially inflated through mis-

---

**6.** Some secondary sources also specifically support an interpretation of § 12(2) under which loss causation is not an element which must be pleaded:

> [Section 12(2)] is thought to create a "broad rescissionary measure of damages," and it allows defrauded buyers to recover damages without showing causation....
>
> Courts and scholars reason from the language of section 12(2) and those interpretations of it, that Congress did not intend to require plaintiffs to prove that the defendant's material misstatements or omissions caused their investments to decline in value. That much is clear.

Michael J. Kaufman, *Loss Causation: Exposing a Fraud on Securities Law Jurisprudence,* 24 IND. L.REV. 357, 369–70 (1991) (footnotes omitted) (quoting Andrew L. Merritt, *A Consistent Model of Loss Causation in Securities Fraud Litigation: Suiting the Remedy to the Wrong,* 66 TEX L.REV. 469, 491 (1988)).

**7.** In *Randall,* a lower court had found defendants liable under § 12(2) for a fraudulent sale in which loss causation was apparently established.

478 U.S. at 651, 106 S.Ct. at 3146. The Supreme Court addressed the issue of whether plaintiffs, who had purchased the security for tax shelter purposes, should receive full rescissionary damages or rescissionary damages reduced by the amount gained through the tax shelter. *Id.* at 649, 106 S.Ct. at 3144. Defendants are correct in asserting that *Randall* does not address the pleading requirements under § 12(2). (Defendants' Reply, at 4 n. 2.) Justice O'Connor's discussion of the § 12(2) rescissionary measure does, however, provide insight into the Court's assessment of Congress' reasons for enacting the section. 478 U.S. at 659, 106 S.Ct. at 3150. Moreover, Defendants' contention that "[n]othing" in *Randall* suggests that a plaintiff may be able to bring a cause of action without alleging *any* loss causation (Defendants' Reply, at 4 n. 2) disregards the language of the opinion. By stating that the risk of loss for a market decline rests on the defendants regardless of what caused the decline, 478 U.S. at 659, 106 S.Ct. at 3150, the Court implies that a plaintiff may recover without any showing *that the fraud itself caused the loss*—if the securities' decline in value is a measure of the plaintiffs' loss.

representations affecting the value the public would place on the security," is not undermined by the omission of loss causation as an element. (Defendants' Reply, at 2.) Omission of that requirement does, however, permit plaintiffs to challenge misrepresentation even without establishing a causal link that may be difficult or impossible to prove. The heightened deterrent provided by this standard thus will induce sellers to be more careful in representing the security—a measure that will, over time, reduce the number of artificially inflated securities.[8]

Finally, Defendants argue that the imposition of a loss causation requirement for § 12(2) claims would prevent abusive lawsuits in which defendants are harassed or forced into settlement. (Defendants' Reply, at 3.) That argument loses sight of the purpose of § 12(2). Even without a loss causation requirement, a plaintiff must still prove that the defendant made a false representation in order to proceed under this section. Thus, a seller can avoid an abusive lawsuit with a carefully drafted prospectus— precisely what the heightened deterrent of § 12(2) is intended to induce. The policy considerations articulated by Defendants do not require that this court read a loss causation element into § 12(2).

### CONCLUSION

The weight of authority supports a conclusion that loss causation is not an element which must be pleaded and proved by Plaintiffs under § 12(2). Although Seventh Circuit case law is inconclusive, other circuits (including one Second Circuit case cited with approval by our Court of Appeals) have directly addressed the issue and found "loss causation" to be unnecessary. In enacting § 12(2), Congress evidently intended to provide extra protection to investors against false statements. Such protection is enhanced by a determination that a plaintiff may proceed under § 12(2) even without a specific showing that the challenged statement actually caused his or her loss. Thus,

---

8. Moreover, there is some indication that a misrepresentation in offering materials will always affect the market price of a security in some fashion, regardless of who receives the misrepresentation. *See Sanders,* 619 F.2d at 1226–27. If

after limited reconsideration, this court again recommends that Defendants' Motion to Dismiss Count III be denied.

Date: August 6, 1993.

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable George W. Lindberg. *See* FED.R.CIV.P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut General Life Ins. Co.,* 900 F.2d 1032, 1039 (7th Cir.1990).

that is true, then requiring plaintiffs to identify a causal connection that is always present will impose needless expense and leave some plaintiffs having valid securities fraud claims without a remedy.